IRVING, J.,
 

 for the Court.
 

 ¶ 1. Jasper C. Sones was convicted by a jury in Oktibbeha County of possession of at least two precursor chemicals with intent to manufacture methamphetamine. The trial court sentenced him to ten years in the custody of the Mississippi Department of Corrections. Aggrieved, Sones appeals and asserts: (1) that the trial court erred in finding that he lacked standing to challenge the legality of the search, (2) that the trial court erred in finding that probable cause existed for the search, and (3) that it was error for the search warrant and the affidavit for the search warrant not to be admitted into evidence.
 

 ¶ 2. We find no reversible error; therefore, we affirm Sones’s conviction and sentence.
 

 FACTS
 

 ¶ 3. On February 28, 2001, Agent Brent Young
 
 [1]
 
 obtained a search warrant for a
 
 *774
 
 house located on County Lake Road in Oktibbeha County, Mississippi. Agent Young had observed Jeremy Sones, Sones’s brother, acting suspiciously earlier that day at a Walmart Supercenter. A search of the house revealed numerous items which are used in the manufacture of methamphetamine. Three people were in the house when the deputies arrived with the search warrant: Sones, Jeremy, and Thomas Lee. All three men were arrested.
 
 [2]
 
 Sones subsequently filed a motion to suppress the materials that were discovered, and a suppression hearing was held.
 

 ¶ 4. At the hearing, Agent Young testified that he learned from the sheriffs department that the house was owned by C.L. Huffman. Thereafter, he contacted C.L. and one of C.L.’s sons and explained that methamphetamine precursors had been discovered at the house. Agent Young recalled that C.L. told him that the men were at the house to perform renovations. Sones testified that C.L.’s son, Keith Huffman, gave him permission to reside at the County Lake Road house while he performed the renovations. However, Agent Young testified that C.L. told him that the men did not have permission to stay overnight at the house. Keith did not testify at the suppression hearing. Thereafter, the trial court denied Sones’s motion, and the case went to trial.
 

 ¶ 5. At trial, Agent Young testified that on February 28, 2001, he went to the grand opening of a Walmart in Starkville, Mississippi to discuss loss prevention with Kim Weston, an employee at the store. While waiting to see Weston, Agent Young witnessed a male, later identified as Jeremy, walk down the aisle which contained over-the-counter medications. Agent Young watched as Jeremy read the labels on several of the bottles. He surmised that Jeremy must have noticed his T-shirt, which bore the letters MBN, because he became nervous and knocked over several bottles of pills. Agent Young testified that Jeremy then took two boxes of Sudafed from the shelf and left that area of the store. Agent Young stated that he remained in the area for a short while longer before following Jeremy to the checkout line, where Jeremy paid for the two boxes of Sudafed, a small book of matches, and two ashtrays. Agent Young stated that Jeremy’s behavior, as well as the items that Jeremy purchased, caught his attention because he knew from his training that striker plates on small match books contain red phosphorus, which is an ingredient used in the manufacture of methamphetamine.
 

 ¶ 6. Agent Young stated that he then followed, what he described as, a nervous Jeremy out of the store and into the parking lot, where he observed Jeremy enter the passenger side of a pickup truck. Agent Young stated that he saw several Walmart bags in the back of the truck.
 
 [3]
 
 Agent Young followed the truck and then contacted Mike Perkins and Steven Solomon, also agents with the Mississippi Bureau of Narcotics, to assist him in the surveillance. They followed the truck to a parking lot and watched it for approximately fifteen minutes. Agent Young stated that he did not see anyone exit the truck. The truck left the parking lot, and Agent Young attempted to follow it but lost contact with it for a short period of
 
 *775
 
 time before reestablishing contact at a Chevron gas station. Agent Young stated that one of the other agents witnessed the men purchase two bags of ice.
 

 ¶ 7. Agent Young testified that the truck then went to the house on County Lake Road and that he conducted surveillance of the house. He recalled that another vehicle left the house at least twice but returned shortly thereafter each time. Agent Young testified that he observed people as they came outside to smoke. Agent Young stated that he surmised that the people had come outside to smoke because methamphetamine was being produced inside the house, as one cannot smoke when methamphetamine is being “cooked.”
 

 ¶ 8. Agent Young left and returned with a search warrant. He recalled hearing movement inside the house as he knocked and announced his presence. Agent Young testified that upon entering the house, he observed three males who appeared to be working. He also stated that it did not appear that anyone was residing in the house, as he noted that the refrigerator was not on.
 

 ¶ 9. Numerous items were recovered during the search of the house, including, but not limited to, matchbooks with the striker plates removed; gallons of acetone; bottles of industrial-strength drain cleaner; a food processor; an altered air pump; hydrochloric acid; generator; Red Devil lye drain opener; lithium batteries; funnels; Sudafed; bottles of kelp; HTH test strips; plastic tubing; ice cream salt; aquarium salt; filters; veterinary-based iodine; red phosphorous (removed from striker plates); a digital scale; bottles of Ephedra 250; a sheet of paper detailing a step-by-step process for manufacturing methamphetamine; a notebook; and an internet printout of frequently asked questions about methamphetamine.
 
 [4]
 

 ¶ 10. The agents also recovered a receipt for Sudafed which was purchased the previous day from a Walmart in Flowood, Mississippi. Additionally, the deputies found in Sones’s wallet six receipts from five different stores with dates ranging from February 10, 2001, to February 28, 2001. The receipt for February 10, 2001, shows that a battery and other items were purchased. Three receipts, all dated February 11, 2001, reveal the following purchases: six boxes of Sudafed, two of which were 96-count packages; a single razor; a four-count package of razors; and a battery. A receipt dated February 13, 2001, indicates that other items were purchased, including two more boxes of Sudafed. Finally, a receipt dated February 28, 2001, also indicates that two boxes of Sudafed were purchased.
 

 ¶ 11. On cross-examination, Agent Young stated that there was no furniture in the upstairs portion of the house. Sones’s attorney pointed out that there was nothing that linked Sones to the items that were found in the house. Sones’s attorney also pointed out that the notebook found in the house contained receipts that could not be conclusively linked to Sones. He also provided reasons, unrelated to the manufacture of methamphetamine, as to why a person would possess such items. Further, Sones’s attorney noted that there are items that are commonly used to manufacture methamphetamine that were not found in the house. Agent Young also stated that, although they did not find a methamphetamine lab,
 
 *776
 
 they did find precursor materials, as well as, two recipes detailing how to manufacture methamphetamine. Additionally, Agent Young noted that the recipes were found in the notebook and that the notebook contained a bill of sale that bore Sones’s signature.
 

 ¶ 12. The defense noted that Sones had completed handwriting exemplars after he was arrested; however, the identity of the writer could not be conclusively established. Sones’s attorney also pointed out that no anhydrous ammonia was recovered from the house.
 

 ¶ 13. Weston also testified at Sones’s trial and stated that in 2001, Walmart had a policy that restricted its customers from purchasing more than three boxes of Su~ dafed. Weston also stated that she observed Jeremy when he was in the store on February 28, 2001. Weston explained that Jeremy’s demeanor and purchases prompted her to point him out to Agent Young.
 

 ¶ 14. Later, Agent Young was called to the stand by Sones’s attorney. He testified that Weston had worked as a paid confidential informant with the Mississippi Bureau of Narcotics on prior occasions and that she was in fact paid for providing information in this case.
 

 ¶ 15. Sandra Price, Sones’s first cousin and Lee’s sister,
 
 [5]
 
 testified on behalf of the defense and stated that she saw Sones briefly on February 28, 2001, at the house on County Lake Road. Price stated that, at that time, the home was owned by her uncle. Price also stated that her uncle had asked her to rent out a house that was located behind the main house. However, according to Price, shortly thereafter she began noticing damage to the property, so her uncle asked Lee to move into the house in either December 2000 or January 2001.
 

 ¶ 16. Price testified that she did not think Lee was involved in the manufacture of methamphetamine and that she never observed any criminal activity at the County Lake Road house. Further, Price stated that she had only visited Lee a few times and that Sones was usually not there when she did. However, she stated that Sones was present when she visited Lee on February 28. According to Price, she knew that Jeremy, Sones, and Lee had been hired to refurbish the house, but she did not know whether Sones had been living there. Price stated that as far as she knew, Lee was living at the house alone. Price also stated that because they tended to work late at night, it is likely that Jeremy and Sones might have spent a few nights at the house.
 

 ¶ 17. Keith also testified on behalf of the defense.
 
 [6]
 
 He stated that his father moved from the property in June 2000 and that it stood vacant until November 2000.
 
 [7]
 
 According to Keith, after learning on the day after Thanksgiving that the house had been broken into, he and Sones went to examine the extent of the damage.
 
 [8]
 
 Keith also stated that he served as the property manager and contracted with S & S Construction to refurbish the house. He noted that Sones is a part owner of S & S Construction and that Sones served as the
 
 *777
 
 general contractor for the project. Keith stated that he granted Sones and Jeremy permission to stay in the basement of the house while they were working on the property because they did not live in the area. Keith explained that subcontractors were also present at the house during the refurbishment. Keith stated that the renovations took place from late December 2000 to January 2001.
 

 ¶ 18. On cross-examination, Keith testified that although his father left some things in the house, he did not think that his father would have left Ephedra, Pseu-doephedrine, Ephedrine, or Acetone. However, Keith stated that his father left bleach and paint thinner at the house. Further, he acknowledged that there had been a problem with a drain in the house, but he stated that he did not think that it would take four or five bottles of industrial-strength drain cleaner to resolve the problem.
 

 ¶ 19. Following the trial, Sones was convicted of possessing at least two precursors with the intent to manufacture methamphetamine.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 ¶ 20. Sones argues that the trial court erred in finding that he lacked standing to challenge the legality of the search of the County Lake Road house. We find that this issue turns on whether Sones had permission to reside overnight at the house, and as reflected above, the testimony as it relates to this issue is conflicting. First, Agent Young testified at the suppression hearing that C.L. told him that Sones did not have permission to stay overnight at the house. Agent Young testified as follows:
 

 Q. Okay. Now, regarding the residence that we’re speaking of, it’s my understanding [that] you indicated you’ve learned during the investigation that it was owned by a C.L. Huffman; is that correct?
 

 A. Yes, ma’am, that’s correct.
 

 Q. You received that information from the sheriffs department here in Ok-tibbeha County?
 

 A. Yes, ma’am, that’s correct.
 

 Q. I understand that once you received that information, you in fact spoke to Mr. Huffman and members of his family, did you not?
 

 A. Yes, ma’am. I spoke with one of his sons prior to speaking with him because Mr. Huffman was in poor health at the time, and they didn’t want to get him alarmed. And I told him what the situation was. This was actually after the search warrant.
 

 * * * *
 

 Q. Agent Young, when you spoke to Mr. Huffman, what information did he give you regarding this defendant, Jasper Sones, and the co-defendant, Jeremy Sones?
 

 A. He told me they were there to refurbish the home because he was trying to get the home livable to either be rented out or to be occupied. At that point, he told me that they were not supposed to be staying at the residence. He was not aware that they were living at the residence. But [based on] duffle bags with clothing and beds in the basement [it] appeared that they were actually residing at the residence while they were working on it.
 

 Q. But he indicated that they did not have permission to live in the residence. They were purely there for business; is that correct?
 

 
 *778
 
 A. To his understanding he was not aware of that, yes, ma’am.
 

 ¶ 21. Second, Keith testified at trial that he gave Sones and the other men permission to live at the house:
 

 once S & S [Construction] was involved in the, you know, [Sones] was appointed general contractor for it, we made arrangement by way of-they could live in the basement because they were traveling from southern Mississippi to northeastern Mississippi. And basically when they would come up to do work there, they would stay there instead of incurring hotel costs.
 

 ¶ 22. Third, Sones provided the following testimony at the suppression hearing:
 

 Q. And at that time that you were doing [the renovations], you were living at the residence?
 

 A. Yes, sir.
 

 Q. On a temporary basis?
 

 A. Yes, sir. We worked pretty much around the clock for three or four days and then we would go home to our families.
 

 Q. And Mr. Keith Huffman, the owner, knew this?
 

 A. Yes, sir.
 

 Q. You had his permission?
 

 A. Yes, sir-.
 

 ¶ 23. As evidenced above, Sones’s contention that Keith gave him permission to reside at the house was corroborated by Keith, despite Agent Young’s testimony that it was C.L.’s position that Sones did not have such permission. We assume, without deciding, that Sones had standing to challenge the legality of the search. Accordingly, we address the issue of whether there was sufficient probable cause for the search warrant to be issued.
 

 ¶ 24. Sones contends that the trial court erred in finding that sufficient evidence existed to warrant the issuance of a search warrant. We disagree. It is well settled that “[t]he admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused.”
 
 Ross v. State,
 
 954 So.2d 968, 992(¶ 44) (Miss.2007) (citing
 
 Irby v. State,
 
 893 So.2d 1042, 1047(¶20) (Miss.2004)).
 

 ¶ 25. During the suppression hearing, the trial judge heard the testimony of Agent Young, Weston, and Sones. Additionally, the underlying facts and circumstances that were prepared by Agent Young in order to obtain the search warrant were admitted into evidence. The trial judge considered all of the evidence before him and agreed with the magistrate, who issued the search warrant, that probable cause existed for the search warrant to be issued. After thoroughly reviewing the record, we also agree. Therefore, we cannot conclude that the trial judge abused his discretion in refusing to suppress the evidence recovered pursuant to the search. This issue lacks merit.
 

 ¶26. Sones also contends that it was error for the affidavit for the search warrant and the search warrant itself not to be admitted into evidence at trial.
 
 [9]
 
 We note at the outset that there is no requirement that the affidavit for a search warrant and the search warrant be admitted into evidence during the trial. Moreover, it is sufficient that both were admitted at the suppression hearing and that the trial judge later overruled Sones’s motion to
 
 *779
 
 suppress, after concluding that “sufficient facts and circumstances were elicited to support a finding of probable cause.... ”
 

 ¶ 27. Also in this issue, Sones contends that the search was essentially “warrant-less” because the affidavit and the search warrant were not admitted into evidence at trial. This assertion is nonsensical. Simply because neither the affidavit nor the search warrant were admitted into evidence does not retroactively render the search warrantless. There is no dispute that the search of the County Lake Road house was conducted pursuant to a search warrant. Clearly, there is no merit to this issue.
 

 ¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF POSSESSION OF AT LEAST TWO METHAMPHETAMINE PRECURSORS AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Young served as an agent with the Mississippi Bureau.of Narcotics at the time of this
 
 *774
 
 incident; thus, we refer to him as Agent Young even though he is no longer employed by the Mississippi Bureau of Narcotics.
 

 [2]
 

 . The charges against Lee were later dismissed.
 

 [3]
 

 . He stated that he could not remember whether the truck had a clear camper or if the glass was missing.
 

 [4]
 

 . Agent Young testified that after being read his
 
 Miranda
 
 rights, Sones identified the notebook as belonging to him. However, when Agent Young asked him if that was his handwriting that appeared on the page that detailed the process for manufacturing methamphetamine, Sones stated that he “could not recall if that was his handwriting or not.”
 

 [5]
 

 . Although it is not clear from the record, we assume that Price is Lee’s sister even though she referred to him as Chessley, and not as Thomas Lee.
 

 [6]
 

 . Keith and the Soneses are cousins.
 

 [7]
 

 . Keith stated that his father holds a life estate in the property and that he holds a fifty-percent remainder interest.
 

 [8]
 

 . Keith clarified on cross-examination that títere was an attempt to break into the house but that the home had not actually been broken into.
 

 [9]
 

 . We point out that the affidavit for the search warrant, the search warrant, and the underlying facts and circumstances for the search warrant were all admitted into evidence at the suppression hearing.